148 August 28, 2014 No. 60

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

DEBORAH ANN MUSSER,
*Respondent on Review.*

(CC 201001347; CA A145540; SC S060868)

En banc.

On review from the Court of Appeals.*

Argued and submitted September 17, 2013.

Rolf Moan, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Peter Gartlan, Chief Defender, Salem, argued the cause and filed the brief for respondent on review.

BALMER, C. J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Walters, J., specially concurred and filed an opinion, in which Baldwin, J., joined.

Brewer, J., specially concurred and filed an opinion.

Baldwin, J., specially concurred and filed an opinion.

_____
* Appeal from Lane County Circuit Court, Debra K. Vogt, Judge. 253 Or App 178, 289 P3d 340 (2012).

**BALMER, C. J.**

This is one of three cases that we decide today in which we examine when evidence obtained pursuant to a voluntary consent search must be suppressed on the theory that the consent was the result of exploitation of prior illegal police conduct. In the first of the three cases, *State v. Unger*, 356 Or 59, ___ P3d ___ (2014), we modified part of the exploitation analysis announced in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). We disavowed the requirement in *Hall* that a defendant must establish a "minimal factual nexus" between the unlawful police conduct and the disputed evidence, and we instead held that, when a defendant challenges the validity of his or her consent based on a prior police illegality, the state bears the burden of demonstrating that the consent was voluntary and was not the product of police exploitation of that illegality. *Unger*, 356 Or at 74-75. We also emphasized that the determination of whether the police have exploited their unlawful conduct to obtain a defendant's consent depends on the totality of the circumstances. That analysis, we stated, should recognize the importance of the voluntariness of the consent and should consider not only the temporal proximity between the unlawful conduct and the consent and any intervening or mitigating circumstances—factors emphasized in *Hall*—but also the nature of the unlawful conduct, including its purpose and flagrancy. *Id.* at 93.

In this case, a police officer on patrol encountered defendant at 10:00 p.m. in an area behind a shopping center where criminal activity frequently occurred. The officer stopped defendant and obtained her consent to search pouches that he saw inside her purse, as well as the remainder of her purse. During those searches, the officer found drugs and drug paraphernalia. Defendant sought to suppress that evidence at trial, arguing, among other things, that the stop had been unlawful and that defendant's consent had been derived from the unlawful stop in violation of Article I, section 9, of the Oregon Constitution. The trial court denied that motion, and defendant was convicted of unlawful possession of methamphetamine at a stipulated facts trial. The Court of Appeals reversed, concluding that the officer had stopped defendant unlawfully and that the

incriminating evidence had derived from that stop. *State v. Musser*, 253 Or App 178, 184, 289 P3d 340 (2012). For the reasons discussed below, we affirm the decision of the Court of Appeals.

A police officer was patrolling an alley behind a shopping center around 10:00 p.m., because he often had encountered people engaging in illegal activity in that area. At that time of night, the majority of the businesses in the shopping center were closed. The businesses that remained open were in the front of the complex, but they were near a walkway that connected the front of the shopping center to the alley that the officer was patrolling. As he drove through the alley, the officer saw defendant and a male companion on the walkway. Because the alley was a place "where people frequently engage[d] in criminal activity," the officer approached defendant and her companion "basically, to make sure they were not doing anything wrong."[1] The officer also believed that they were trespassing because of the time of night.

As the officer approached in his car, which had its spotlight and alley lights on, defendant started to walk towards the front of the shopping center. The officer got out of his car and said "Hey, I need to talk to you." Instead of talking to the officer, however, defendant continued walking toward the front of the shopping center, prompting the officer to say "in a more direct, firm tone," "Hey, come back here. I need to talk to you." Defendant came back to speak to the officer, but told him that she wanted to return to the front of the shopping center where her friends were.

The officer requested defendant's identification. Defendant was "nervous" and "fidgety." Based on defendant's "inability to stand still" and her "nervousness as compared to the male, who was completely calm," the officer suspected that defendant had recently used methamphetamine or some other stimulant.

While defendant was looking through her purse for identification, the officer noticed two Crown Royal pouches in her purse. Based on his suspicion that she had recently

---

[1] The quotations in the factual summary are from testimony below.

used methamphetamine, the officer "thought it was more likely than not that she probably had some controlled substances in her purse." After the officer ran the name on defendant's identification, he "asked for her consent to search the two Crown Royal pouches that were in her purse, and she agreed." Inside one of the pouches, the officer discovered a metal spoon with burn marks on it, a small metal scraping tool, and a small black pouch with white residue inside. The officer believed that the spoon and the scraping tool had been used in connection with methamphetamine, and he therefore suspected that the white residue was methamphetamine.

After the officer searched the Crown Royal pouches, a second officer arrived to assist with the investigation. The first officer then asked for defendant's consent to search the remaining contents of her purse, and defendant agreed. During that search, the officer discovered a third pouch containing a bag with a white crystalline substance inside that later tested positive for methamphetamine. The whole interaction, from when the officer initially contacted defendant to when he wrote her a citation, lasted about an hour.

The state charged defendant with unlawful possession of methamphetamine, and defendant moved to suppress her statements and the items found in her purse. Defendant argued, among other things, that the officer had stopped her unlawfully and that, to the extent that she had consented, her consent had been "derived from" the unlawful stop.[2] The trial court denied defendant's motion to suppress, reasoning that the officer had "reasonably suspected that some criminal activity was afoot" when he had stopped defendant. The case proceeded to a stipulated facts trial, and the court found defendant guilty.

On appeal, the parties focused their arguments on whether the officer had had reasonable suspicion to stop

_____

[2] In her memorandum in support of the motion to suppress, defendant also argued that her consent was "not knowing or voluntary." The trial court did not address that issue, and defendant did not raise it on appeal or in her brief before this court, instead focusing on the exploitation prong of the analysis. At oral argument, defense counsel "acknowledge[d] that the consent [had been] voluntary," so we do not address that issue.

defendant, and the Court of Appeals likewise focused its opinion on that issue. *See Musser*, 253 Or App at 181 (stating that the "issue on appeal is whether [the officer] had reasonable suspicion to stop defendant for criminal trespass"). The court addressed defendant's exploitation argument in a single sentence: "Because [the officer] stopped defendant without reasonable suspicion and there is no dispute that the evidence he subsequently obtained derived from that stop, the trial court erred by denying defendant's motion to suppress."[3] *Id.* at 184.

The state sought review. On review, the state concedes that the officer stopped defendant without reasonable suspicion, in violation of Article I, section 9. The state argues that, despite that illegality, the evidence discovered in defendant's purse should not be suppressed. As in *Unger*, the state argues that, if a police illegality is followed by a voluntary consent to search, then any evidence obtained as a result of that search is admissible. The state acknowledges that that result would require this court to overrule *Hall*. Alternatively, the state argues that this court should modify *Hall* as it did in *State v. Hemenway*, 353 Or 129, 295 P3d 617, *vac'd as moot*, 353 Or 498, 302 P3d 413 (2013), by emphasizing that the exploitation analysis set forth in *Hall* overvalued the temporal proximity between the illegality and the consent, while undervaluing the defendant's voluntary consent.

Under either test, the state argues, the evidence in this case should not be suppressed. Under its proposed rule, the state argues, defendant's consent to both searches was voluntary, and that fact—in and of itself—provides a basis for denying a motion to suppress. Even if this court rejects that approach, the state argues that, under its alternative

---

[3] The state had conceded that, under the Court of Appeals' prior applications of *Hall*, the evidence was the product of the stop. The state noted, however, that in its view, *Hall* did not set forth the proper test for when a prior police illegality requires suppression of evidence obtained pursuant to a consent search. Instead, the state argued, as it does here, that the only relevant inquiry was whether the consent was voluntary. Nonetheless, the state acknowledged that only this court could modify or overrule *Hall*, and the state noted that this court likely would address the issue in *State v. Hemenway*, 353 Or 129, 295 P3d 617, *vac'd as moot*, 353 Or 498, 302 P3d 413 (2013), which was pending before this court at that time.

proposed rule, nothing about the interaction "significantly affected" defendant's decision to consent because the interaction was short, the officer did not physically restrain defendant, and the officer was not otherwise aggressive or intimidating.

Although defendant agrees that this court should disavow the minimal factual nexus test from *Hall*, as the court did in *Hemenway*, defendant argues that this court should retain the remaining exploitation analysis set forth in *Hall*, rather than modifying it as we did in *Hemenway*. Defendant argues, however, that the evidence must be suppressed under the analysis articulated in either *Hall* or *Hemenway* because the officer requested consent to search shortly after the unlawful stop, there were no intervening or mitigating circumstances, and the interaction never deescalated from a criminal investigation into mere conversation.

In *Unger*, today we held that the determination as to whether evidence found in a search should be suppressed because police exploited their violation of a defendant's Article I, section 9, rights to obtain consent to the search requires consideration of the totality of the circumstances surrounding the police-defendant encounter. In reaching that conclusion, we rejected both the state's view that voluntary consent generally cures any taint that might have arisen from prior police misconduct and the defendant's view that voluntary consent that follows unlawful police conduct generally is the product of exploitation and must lead to suppression, in the absence of mitigating or intervening circumstances, such as *Miranda* warnings or an admonition that consent need not be granted. As part of the totality of the circumstances, we described the considerations relevant to determining whether the police improperly "took advantage of" or "exploited" their unlawful conduct to gain the defendant's consent to search. We noted that voluntary consent was an important, but not dispositive consideration, and we examined the nature of the unlawful conduct, including its purpose and flagrancy, the temporal proximity between the unlawful conduct and consent, and the presence of intervening or mitigating circumstances. We also recognized,

as we had in *Hall*, that evidence should not be excluded on exploitation grounds if it inevitably would have been discovered or if the police discovered the evidence though a source independent of the illegality. *See Unger*, 356 Or at 64.

We applied those considerations in *Unger* and concluded that the evidence in that case did not have to be suppressed. There, four detectives went to the defendant's house in response to a complaint about drug activity and information from an informant that there were children at the house with access to drugs and guns. When knocking on two front doors failed to elicit any response, detectives trespassed onto the defendant's property by following a path around to the back of the house, where they knocked on a sliding glass door. Defendant came to the door and, after the detectives explained why they were there, the defendant consented to the detectives entering the home, then agreed to show them around the house. While walking through the house, one detective discovered a bag with methamphetamine residue. There, we concluded that the misconduct was limited in extent, nature, and severity because the officers had followed a path around the house without crossing any barriers and the detectives had interacted with the defendant just as they would have at the front door. *Id.* at 89-90. Moreover, the detectives' purpose in going to the back door was to contact the defendant, not to make the defendant more likely to consent. *Id.* at 91. Although the consent had been given in close temporal proximity to the illegality, and there were no intervening or mitigating circumstances, under the totality of the circumstances, the state met its burden of showing that the detectives' minimal intrusion did not require suppression. *Id.* at 92.

Similarly, in *State v. Lorenzo*, 356 Or 134, ___ P3d ___ (2014), which we also decided today, we affirmed the trial court's denial of a motion to suppress evidence obtained pursuant to a voluntary consent search that followed an officer opening the defendant's apartment door and reaching into the apartment to knock on his bedroom door. There, because the officer was concerned for the defendant's safety, the officer had made repeated attempts to contact the defendant before reaching inside the apartment to knock on the

bedroom door. After knocking on the defendant's bedroom door, the officer waited outside the apartment until the defendant came to the door and consented to allowing the officer to enter the apartment. When he entered the apartment, the officer smelled marijuana, and the defendant then consented to a search of his bedroom. Applying the *Unger* analysis, we noted that there was temporal proximity between the illegality and the consent, but that other considerations cut in the opposite direction. *Id.* at 143. In particular, we reasoned that the search was limited in extent and severity and was not an effort to direct or control the defendant. *Id.* at 144. Moreover, although there were no intervening or mitigating circumstances, the purpose of the search was to check on the defendant's welfare and not to conduct an investigation. *Id.* at 144, 145. As to flagrancy, we acknowledged that entry into the defendant's apartment was unlawful, but explained that the officer's conduct was restrained, without threats or intimidation. *Id.* at 145-46. Based on all those considerations, we concluded that the state had met its burden of showing that the police did not exploit their unlawful conduct to obtain the consent.

We now apply the principles set out in *Unger* to the facts here. A police officer saw defendant on a walkway behind a shopping center at a time when most of the businesses were closed. The area was one where the officer knew that illegal conduct took place. The officer directed defendant to come speak to him, saying, "Hey, I need to talk to you." When defendant continued walking, the officer stated, in a "more direct, firm tone," "Hey, come back here. I need to talk to you." Defendant complied. As the state concedes, the officer lacked reasonable suspicion that defendant had committed a crime, and the officer's conduct was an unconstitutional stop of defendant. The stop continued for about an hour until defendant was cited and released. In our view, the stop here was a more severe violation of defendant's rights than the violation in *Unger*, which was a daytime trespass onto the defendant's property that allowed the police to contact the defendant at his back door, or the similar conduct in *Lorenzo*, where the officer reached into the defendant's apartment to knock on the defendant's bedroom door in an effort to contact him because of concern for his safety. Here,

the police order to defendant to return and talk to the police, rather than to continue in the direction she was heading, clearly indicated to defendant that she had no choice but to respond to the order, bringing her significantly under the control of the police.

Defendant also is correct—and the state does not dispute—that the request to defendant to consent to the search of her purse occurred during the unlawful stop, thus establishing the "temporal proximity" that our cases, including *Unger* and *Hall*, have indicated is a relevant consideration in the exploitation analysis. The state does not argue that the evidence found in defendant's purse would have "inevitably" been discovered or that it would have been (or was) discovered by a means independent of defendant's consent.

Neither does the state argue that intervening or mitigating circumstances—other than defendant's voluntary consent to the search—occurred between the unlawful stop and the discovery of the evidence. Rather, the state's central argument is that defendant's consent to the request to search the pouches and her purse, because it was voluntary, was sufficient to vindicate defendant's rights. Put differently, the state argues that, because a voluntary-consent search is "reasonable," defendant's right to be free from "unreasonable" searches was not violated. In *Unger*, we accepted the state's argument that this court in *Hall* had failed to give sufficient weight to an individual's voluntary consent to a search. We did not, however, suggest that voluntary consent always would "trump" the effect of prior police misconduct; rather, we identified a number of nonexclusive considerations that should be considered in reviewing the totality of the circumstances to determine whether the police "exploited" or "took advantage" of their unlawful conduct to obtain the consent. *See Unger*, 356 Or at 79-80.

We return to a discussion of those considerations in this case. We observed in *Hall* and reaffirmed in *Unger* that exploitation of police misconduct may exist if the police seek the defendant's consent solely as a result of knowledge of inculpatory evidence obtained from their unlawful conduct. *Hall*, 339 Or at 35; *Unger*, 356 Or at 76. The facts support

defendant's argument that such exploitation occurred here, because the officer pursued several lines of inquiry "spurred by his observations of the contents of defendant's purse during the unlawful seizure." After defendant, at the officer's direction, came towards him, he asked for identification. While defendant was looking through her purse for identification, the officer saw the two Crown Royal pouches. Because of his observation that she was nervous and fidgety, and his suspicion that defendant had drugs in the purse, when the officer saw the Crown Royal pouches—in which, as the trial court observed, drug users often carry their drugs—he asked for consent to search them. In contrast to the facts in *Unger*, where the trespass onto defendant's property only brought the police into contact with the defendant, or the similar circumstances in *Lorenzo*, the unlawful police conduct here led directly to observations, including observation of the pouches that the officer suspected contained drugs, and then to the request for consent to search. Here, there was not simply "but for" causation—unlawful police conduct and then a request for consent. Instead, the unlawful conduct led to the request for identification, which led to observation of pouches that the officer believed contained drugs, which led to the request to search and the evidence ultimately obtained. That evidence was the product of the initial unlawful stop.

In *Unger*, we also identified the "purpose and flagrancy" of the misconduct as relevant to determining exploitation. As we discussed there, the inquiry into "purpose" is not focused on the officer's subjective intent, but on the objective circumstances, including verbal and nonverbal conduct, that may indicate whether police took advantage of the prior illegality to obtain defendant's consent. 356 Or at 82-83. Here, without—the state concedes—probable cause or reasonable suspicion to believe that defendant was committing any crime, the officer violated the constitutional rights of defendant and her friend for the purpose of "basically [making] sure they were not doing anything wrong: Breaking the law, damaging any property."

Police obviously need reasonable leeway to investigate and prevent crimes, and monitoring locations where criminal activity frequently occurs and where trespassers

are often found is part of good police work. But police are not authorized to detain and question citizens merely to "make sure they [are] not doing anything wrong." The purpose of the unlawful stop here—in contrast to the "knock-and-talk" in *Unger*, which was precipitated by information about the presence of drugs, guns, and children in a particular house—apparently was a "shot in the dark" to check for criminal activity.[4] But here, even that generalized concern about trespassing and criminal activity gave way as the encounter developed, with the officer eventually focusing—as defendant well understood—on drug possession. The initial and developing purpose of the police misconduct in continuing to detain defendant while inquiring about various possible crimes shows the state taking advantage of that misconduct in a way that likely had an effect on defendant's decision to consent.

As to the flagrancy of the police conduct, the state argues that the seizure was only "minimally restrictive," that defendant was never handcuffed, and that the police were not—and were not perceived by defendant to be—aggressive or intimidating. All that may be true. But flagrancy is simply one consideration in the larger exploitation analysis. We agree with defendant that police may not purposefully and severely interfere with a person's Article I, section 9, rights—even if they do so politely.

For the reasons set out above, and applying the analysis described in *Unger*, we conclude that the police improperly exploited their unlawful stop of defendant to obtain her consent to the search. We agree with the Court of Appeals that the resulting evidence should have been suppressed.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[4] The purpose of the unlawful stop here also stands in contrast to *Lorenzo*, where the officer went to the defendant's apartment to check on him after learning that the defendant's roommate, who had just tried to commit suicide, owned a gun. Nothing in the record there indicated that the officer was concerned about any criminal activity on the part of the defendant when the officer knocked on the defendant's interior bedroom door.

**WALTERS, J.,** specially concurring.

I concur in the judgment of the court and its reasoning that, because the unlawful stop "led to the request for identification, which led to the observation of pouches that the officer believed contained drugs, which led to the request to search and the evidence ultimately obtained," the "evidence was the product of the initial unlawful stop" and must be suppressed. *State v. Musser*, 356 Or 148, 158, ___ P3d ___ (2014). I also agree that the officer took advantage of the unlawful stop "in a way that likely had an effect on defendant's decision to consent." *Id*. at 159. I write, however, with a plea for consistency and simplicity.

In *State v. Unger*, 356 Or 59, ___ P3d ___ (2014), the majority specifically declared that it was adhering to the following principle articulated in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and other cases: "A causal connection requiring suppression may exist because the police sought the defendant's consent solely as a result of knowledge of inculpatory evidence obtained from unlawful police conduct." *Unger*, 356 Or at 86. The majority described the connection between the illegality and the consent to search as "a direct causal connection." *Id*. The majority then went on to discuss "less direct exploitation," which, it said, requires consideration of the totality of the circumstances to determine whether the consent was sufficiently related to the unlawful police misconduct to require suppression. *Id*.

To me, this case is a perfect example of the "direct causal connection" described and adhered to in *Unger*, and the court apparently does not disagree. *Musser*, 356 Or at 157-58. However, the court nevertheless goes on to discuss whether the constitutional violation was severe, purposeful, or flagrant. When previously describing the exploitation that occurs in circumstances of "direct causal connection," the court has not considered the factors applicable in "less direct exploitation" cases, and I question whether that complexity is necessary or desirable. The cause of consistency and simplicity would be advanced if the court were to conclude, without adjectival measuring, that, in this case, the evidence must be suppressed because the officer violated

the constitution, obtained an advantage that he otherwise would not have had, and then exploited that advantage to obtain consent to search.

The cause of consistency also would be advanced if the court were to recognize that the same reasoning that requires exclusion of the inculpatory evidence in this case requires exclusion of the inculpatory evidence at issue in *Unger*. In both cases, the officers approached the defendants to try to ascertain whether criminal conduct was taking place. In this case, the officer violated the constitution because he stopped defendant without reasonable suspicion. In *Unger*, the officers violated the constitution because they invaded the defendant's property and privacy without his permission. In both cases, the officers gained an advantage that they would not have had had they operated within the law. In this case, the unconstitutional stop permitted the officer to get defendant's attention, see pouches, and ask for consent to search. In *Unger*, the unconstitutional intrusion permitted the officers to get the defendant's attention and ask for consent to search. To be consistent, the court, in both cases, should require the suppression of the evidence that the officers obtained by pressing their advantage.

I am heartened that, in this case, the court recognizes the causal link between the constitutional violation and the inculpatory evidence and orders its suppression. I take hope from the fact that, in *State v. Ayles*, 348 Or 622, 636, 237 P3d 805 (2010), *State v. Rodgers/Kirkeby*, 347 Or 610, 629-30, 227 P3d 695 (2010), and *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005), the court recognized the same causal link and also ordered suppression, and that, in the trilogy of cases decided today, this court did not explicitly overrule those cases. My plea is that, in the years to come, courts will continue to adhere to the reasoning in this and those cases and, in doing so, will make the law more consistent, more easily applied, and more true to its constitutional purpose.

Baldwin, J., joins in this opinion.

**BREWER, J.,** specially concurring.

I concur in the judgment of the court but, for the reasons stated in my dissenting opinion in *State v. Unger*,

356 Or 59, 121-22, ___ P3d ___ (2014) (Brewer, J., dissenting), I am unable to join in the opinion of the court in this case.

**BALDWIN, J.,** specially concurring.

I concur in the judgment of the court but, for the reasons I explained in my dissenting opinion in *State v. Unger*, 356 Or 59, 133, ___ P3d ___ (2014) (Baldwin, J., dissenting), I do not join the majority's reasoning in this case.