Argued and submitted March 25, 2014, reversed and remanded on Count 1; otherwise affirmed February 19, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RODNEY ALLEN KUSCHNICK,
*Defendant-Appellant.*

Marion County Circuit Court
12C40094; A151805

344 P3d 480

Alice S. Newlin, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction for delivery of methamphetamine, assigning error to the trial court's denial of his motion to suppress evidence obtained during a traffic stop. While defendant was driving late at night, an officer stopped defendant's car after observing a traffic violation, and, in the course of the stop, discovered that defendant was driving with a suspended license and that defendant's passenger resembled a suspect in an unsolved identity theft. Ultimately, the officer, who was joined by another officer, could not find any information about the identity theft, so he told defendant that he would be cited and that the passenger could drive the car, and he filled out the citation. Instead of giving the citation to defendant, however, the officers stood on either side of the stopped car, directed defendant and the passenger to get out of the car to switch places, and asked defendant and the passenger each to consent to a patdown search. Defendant gave consent, and the search revealed brass knuckles, leading to defendant's arrest for felon in possession of a restricted weapon, a search of his car, and, ultimately, after a warrant was obtained, a search of a bag found in the car, which revealed evidence of drug delivery.

Defendant principally argues that officers unlawfully seized him, in violation of Article I, section 9, of the Oregon Constitution, by unreasonably extending the duration of the traffic stop. Defendant contends that, although the initial traffic stop was lawful, the officers unlawfully extended the stop when, after they completed the identity theft investigation of the passenger and completed defendant's traffic citation, they retained the citation and directed defendant and the passenger to get out of the car and switch places. He further asserts that the consent search was the product of the unlawful extension of the stop, that the illegality of that search tainted the later searches of the car and bag, and that the evidence discovered as a result of those searches should have been suppressed. For the reasons below, we agree with defendant and, accordingly, reverse and remand.

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Ehly*, 317 Or

66, 75, 854 P2d 421 (1993). In doing so, we are bound by the trial court's express and implicit factual findings if there is constitutionally sufficient evidence in the record to support them. *Id.* We state the facts in accordance with that standard.

While patrolling in Salem, Officer Baskett saw a red Chevrolet Monte Carlo, a car he believed might be the same one that he had seen in surveillance photographs relating to an unsolved identity theft. Using his in-car computer, Baskett determined that the car was registered to Rose Kuschnick. He recalled that Rose had two sons, and that one of them, defendant, had eluded police during a drug investigation a few years earlier. Although Baskett could not identify the driver or the passenger as he followed the car, Baskett ran a status check on defendant, which revealed that defendant's license was suspended.

After Baskett observed a traffic violation (signaling less than 100 feet before turning), he stopped the vehicle and discovered that defendant was the driver. Although Baskett at that point knew that defendant was driving while suspended, he also knew, based on the surveillance photos, that defendant was not involved in the identity theft. Baskett asked defendant for his driver's license, car registration, and insurance information, and defendant "began digging around" in the car's center console. When Baskett then asked whether there were any guns or weapons in the car, defendant "continued to dig in the console and ignored the question." Based on what he knew of defendant's past contact with police, Baskett became concerned for his safety and drew his handgun, pointed it at defendant, and repeated his question about guns and weapons. Defendant removed his hands from the console and handed the officer an expired insurance card. He also handed Baskett an Oregon identification card from his wallet, and Baskett noticed that defendant had a large amount of cash in his wallet and that there was a police scanner in the car near defendant's legs. Baskett associated police scanners with individuals who "monitor what the police activity is to avoid police contact."

While Baskett talked to defendant, the passenger in the car sat quietly. Baskett noticed that the passenger

resembled the person Baskett had seen in the surveillance photos of the identity theft case. Wanting to look into that case, Baskett requested that another officer, Dowd, come to the scene. While Dowd waited at the stopped car, Baskett returned to his patrol car to see if he could locate the "suspect photos" for the identity theft. He was "not able to come up with any information," however, so he returned to the stopped car.

When Baskett returned to the car, he told defendant that he would be getting a ticket for driving while suspended and asked the passenger whether he had a driver's license so that he could drive the car away. The passenger gave Baskett his license. Baskett returned to his patrol car with the license and verified that it was valid. Baskett then filled out the citation for defendant.

When Baskett again returned to the stopped car, he "opened the passenger door where the passenger was and * * * told him that he could get out of the car because he said he could drive the car and his license was valid." Although Baskett did not tell the passenger that he could stay in the car if he wished, Baskett testified that, if the passenger and defendant had wanted to stay in the car, "[t]hey could have just sat there" and Baskett "would have waited down the street" to make sure that defendant was not driving.

The passenger did not immediately get out of the car; he, instead, glanced at his feet and asked Baskett why he wanted him to get out of the car. Baskett responded that they had talked about him driving the car away, and the passenger responded that he would "if [Baskett] would let him." The passenger, who was wearing a "bulky grey coat," then stepped out of the car. Because the passenger had glanced at his feet and did not want to get out the car, Baskett was concerned that he might have a weapon on him or near him in the car; he asked the passenger if he could "check him for weapons." The passenger consented, Baskett found no weapons, and he directed the passenger to step to the front of the car.

While Baskett was with the passenger, Dowd went to talk to defendant, who was still in the driver's seat. In Dowd's view, defendant was free to leave at that point and

would have been free to stay in his seat if he did not want to step out of the car. Dowd told defendant "that [he] was going to be asking [defendant] to step out of the car," but before Dowd did so, he "asked if [defendant] had any weapons on his person." When defendant said he did not, Dowd "went ahead and asked him to step out of the vehicle." As defendant was getting out of the car, Dowd asked for permission to pat him down for weapons, and defendant consented. Dowd then asked defendant if he had anything that was going to cut or poke him during the search, and defendant responded that he had brass knuckles in his back pocket. Dowd patted down defendant's back pockets and located what felt like brass knuckles; he told Baskett that defendant had a weapon. At that point, because Baskett was aware that defendant was a convicted felon, he knew that defendant was committing the crime of felon in possession of a restricted weapon.[1]

Baskett asked defendant if there were any other weapons in the car, and defendant said that there was a "folding knife" in the center console. Baskett told defendant that he needed to check inside the car for weapons to make sure it would be safe for the officers to allow him to get back in the car and leave. Defendant "became very loud and irate" and objected to the search. Defendant was handcuffed, put in the back of the patrol car, and given *Miranda* warnings.

When searching the vehicle, Baskett found the folding knife in the console (which Baskett concluded was not an illegal weapon) and a cloth bag under the driver's seat. Although the bag did not "have the heft for a firearm," Baskett felt the bag to see if there was a knife or brass knuckles in it. Instead of feeling weapons, Baskett felt several items that seemed to be objects associated with illegal drug use, including an object shaped like an electronic scale, plastic baggies, and a soft "crystalline substance" that "had the consistency of * * * crystal methamphetamine."

---

[1] ORS 166.270(2) provides that a convicted felon who "owns or has in the person's possession or under the person's custody or control * * * metal knuckles" and other prohibited weapons "commits the crime of felon in possession of a restricted weapon."

Baskett confirmed with the passenger that he was still willing to drive the vehicle from the scene. He then issued defendant two citations (for driving while suspended and felon in possession) and a receipt for the items he was seizing: the brass knuckles, the police scanner, and the cloth bag. Later, a police dog alerted on the bag, indicating the presence of controlled substances. Relying on those facts, Baskett applied for and received a search warrant to search the bag.

Defendant moved to suppress "any and all evidence seized by police" on the night he was stopped "and any subsequent statements/evidence taken from him in connection with the stop" under Article I, section 9.[2] As explained in more detail below, defendant argued that "[t]he officer did not timely issue citations for the traffic violations, but illegally extended the traffic stop to do exploratory searches and seizures[.]" He also argued that, apart from the unlawful extension of the stop, the officer "searched and seized a closed container in the vehicle without probable cause and without a warrant or any other exception to the warrant requirement." The trial court denied defendant's motion to suppress, reasoning that, "[e]ven though the length of the traffic stop exceeded two hours, * * * the officer's conduct was consistent with the law in that new issues continued to be revealed throughout the stop." It followed, in the court's view, that the stop had not been "illegally extended." The court also ruled that "the officer's search of the closed container by use of his hands touching the outside exterior of the bag was a legal search incident to arrest and fell within the exception involving mobile vehicles."

After defendant's motion was denied, he waived his right to a jury, proceeded by a stipulated facts trial before the court, and was found guilty of one count of delivery of

---

[2] Article I, section 9 provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" In his written motion to suppress, defendant also argued that the police violated his rights under the Fourth Amendment to the United States Constitution, but he makes no argument under the federal constitution on appeal.

methamphetamine.[3] On appeal, defendant again argues, primarily, that the evidence of methamphetamine and paraphernalia found in the bag should have been suppressed because that evidence was the product of an unlawful seizure of defendant's person. He also argues that, even if the police lawfully seized him, the evidence found in the bag was the product of an unlawful search of the car.

Before addressing defendant's claim that he was unlawfully seized, we review the undisputed legal principles that underlie that argument. There is no dispute that Baskett's initial traffic stop, though it constituted a seizure, was justified by Baskett's observation of a turn-signal violation and then by his discovery that defendant was driving with a suspended license. Baskett had authority to perform a traffic stop because he had "probable cause to believe that [defendant engaged in] unlawful, noncriminal activity, *viz.*, a traffic infraction." *State v. Rodgers/Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010). But Baskett's authority to hold defendant was not unlimited: "[A]uthority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed." *Id.* And once that investigation and issuance of the citation was (or should have been) completed, Article I, section 9, required a justification for any extension of the stop "on some basis other than the traffic violation," *e.g.*, because Baskett had reasonable suspicion of criminal activity unrelated to the traffic violation. *Id.*; *see State v. Watson*, 353 Or 768, 785, 305 P3d 94 (2013) ("[A]n officer may develop reasonable suspicion *** during the course of a traffic stop that may justify activities that would

---

[3] Defendant stipulated that the bag contained "over 12 grams of methamphetamine" and that "[t]he amount of drug together with the paraphernalia and packaging are more consistent with possession with intent to deliver rather than possession for personal use."

Apart from the delivery of methamphetamine charge (Count 1), defendant was charged with possession of methamphetamine (Count 2), delivery of a Schedule III controlled substance (hydrocodone) (Count 3), and felon in possession of a restricted weapon (metal knuckles) (Count 4). In the judgment of conviction on the delivery of methamphetamine charge (Count 1), the trial court dismissed Counts 2 through 4 on the state's motion. Counts 2 through 4 are not at issue on appeal, and, accordingly, we affirm the dismissal of those charges.

not have been permissible based on the original purpose of the stop.").

On appeal, defendant argues that Baskett exceeded the bounds of a lawful traffic stop at two points in time. First, defendant argues that Baskett unlawfully extended the stop when, instead of processing and issuing the citation, he investigated the identity theft case. Defendant points out that the officer knew that defendant was not involved in the identity theft and argues that the officer could not hold *defendant* based on the officer's reasonable suspicion that *the passenger* was involved in the identity theft. Defendant further contends that, in any event, Baskett's beliefs related to the passenger did not amount to reasonable suspicion. Second, defendant contends that, even if Baskett lawfully extended the stop to investigate the passenger, he unlawfully "extended the stop when he completed his identity theft investigation of the passenger and completed defendant's traffic citation, but did not give the form to defendant." In other words, to the extent that the continuation of the stop was justified by Baskett's reasonable suspicion of the passenger's involvement in the identity theft, that justification evaporated when Baskett completed his identity theft investigation; the continued detention became unlawful at that point.

In response, the state first argues that Article I, section 9, allows an officer to temporarily shift from investigating a driver's traffic infraction to investigating a *passenger's* criminal activity, when the officer has reasonable suspicion of criminal activity as to the passenger but not the driver. And, in the state's view, Baskett had reasonable suspicion that the passenger was involved in the identity theft. As to defendant's argument that the stop became unlawful when Baskett had completed the traffic investigation and identity theft investigation but continued to detain defendant, the state argues that defendant failed to preserve that argument. The state contends that, in the trial court, "defendant looked no further than the initiation of that investigation for his unlawfully extended stop argument."

We start with the state's argument about preservation. To preserve his argument for appellate review, defendant

was required to provide an explanation of his position "specific enough to ensure that the [trial] court [could] identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction [was] warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). In the trial court, defendant, in his written motion to suppress, generally argued that the officers detained him beyond the time required to issue the citation for the traffic infraction; the state argued, in a written response and in a closing argument at the suppression hearing, that Baskett lawfully extended the stop based on his reasonable suspicion that the passenger was involved in the identity theft.[4] The parties' dispute about preservation centers on how defendant responded to the state's argument. Was defendant's sole response to attack the state's suggestion that Baskett lawfully extended the stop based on reasonable suspicion that the passenger was involved in the identity theft?[5] Or did defendant further argue, as he does on appeal, that, regardless of whether Baskett had reasonable suspicion as to the passenger's involvement in the identity theft, the officers unlawfully extended the stop when they failed to release defendant after the identity theft investigation had ended?

The record shows that, although defendant primarily argued that the officers unlawfully extended the stop by

---

[4] In his motion to suppress, defendant argued that, because the officers "detain[ed] him beyond the time required to issue the citations," they "illegally extended the traffic stop." Defendant also anticipated that the state might rely on some other basis, beyond the traffic violation, for the stop; he argued that, "[t]o the extent the state seeks to support the detention of the defendant based on facts other than the traffic stop[,] the facts set forth in the police report do not support a 'reasonable suspicion' the defendant was involved in illegal activities." In its written response, the state countered that Baskett "had reason to believe that the car was connected to an identity theft case" and he "contacted his agency concerning the identity theft case in order to find out if * * * defendant or the passenger were persons of interest in that case." At the close of evidence at the suppression hearing, the state continued to focus on the identity theft investigation, arguing that the stop was justifiably continued because the officer discovered that the passenger resembled someone involved in the identity theft.

[5] We agree with the parties that the record shows that defendant made arguments in the trial court that mirror his initial argument on appeal—that Baskett unlawfully extended the stop when he began the identity theft investigation, either (1) because the officer knew that defendant was not a suspect in the identity theft case and there was no basis on which to hold him or (2) because Baskett's belief about the passenger's involvement did not amount to reasonable suspicion.

initiating the identity theft investigation, his argument did not end there. When asked by the court if the officers had a "basis to arrest" defendant, defense counsel responded that the basis for arrest (*i.e.*, the discovery of the brass knuckles) "took place" after the "traffic stop basis" and "identity theft issues" had "expired":

> "I don't agree that there was a basis to arrest him in connection with the traffic stop. *The basis to arrest him took place after he should have been free to leave* and clearly both officers indicate well, if he would [have] stayed in the car and taken an issue with me, I would have just driven down the street and Officer Baskett, I guess, [would have] waited to see if he tried to drive the vehicle off. So once you reach that stage in the proceedings, you've *expired both the traffic stop basis* and you've *expired the suspicion of identity theft issues* and *anything that happens after that is a constitutional violation* under * * * the authorities I cited in my memorandum.

> "Now, again there was additional illegal searches subsequent to that, but * * * once he's free to leave and both officers indicated he was, then anything after that is an exploitation of the stop by extending the stop illegally and basically, seizing [defendant]."

(Emphasis added.) In other words, defendant argued that, by the time the officers developed a basis to arrest defendant, *both* possible justifications for detaining defendant— investigating the traffic violation and investigating the identity theft—had "expired." And he supported that argument by referencing testimony from Baskett and Dowd that, after Baskett filled out the citation and returned to the car, the encounter would have ended if defendant would have "taken an issue" with the officers' instructions.

The state observes, correctly, that defendant did not focus on the specific police actions that effected the unlawful extension—*i.e.*, Dowd's standing by the driver's door, his instruction that defendant get out of the car and swap positions with the passenger, and his request to search. But there was no question in the trial court that those actions represented a continuation of the stop; the state acknowledged that the brass knuckles were found while the stop was ongoing but suggested that it was part of the traffic

investigation.[6] In response, then, defendant understandably endeavored to establish that, by the time the brass knuckles were found, the stop was no longer "reasonably related to the traffic violation" or "justified on some basis other than the traffic violation," *i.e.*, the identity theft investigation. *Rodgers/Kirkeby*, 347 Or at 623 (emphasis omitted). By doing that, defendant preserved his argument for our review.

Our resolution of the threshold question on preservation narrows, and simplifies, our determination as to whether the officers unlawfully extended the stop. Even if we agree with the state's argument that the officers permissibly shifted from investigating defendant's traffic infraction to investigating the passenger's possible involvement in the identity theft, the question remains whether, once Baskett filled out the citation for the traffic violation and completed the identity theft investigation, the officers were justified in continuing the stop. The state does not address that argument on the merits, and, given the record in this case, we readily conclude that the state did not establish that the officers were justified in continuing the stop.[7] Baskett had

---

[6] The state argued that the brass knuckles were found as part of "the release of the car," an event "within the course of the traffic stop":

"They're dealing with the release of the car at that time, so they're justifiably within the course of the traffic stop and they find out the defendant is in possession of brass knuckles. The case then expands * * * from a traffic stop to a criminal investigation because the defendant is committing a crime in the presence of the police officers."

The state is therefore incorrect in suggesting that *State v. Amaya*, 336 Or 616, 89 P3d 1163 (2004), informs the preservation question here. In that case, the defendant, a passenger in a vehicle, argued that she had been unlawfully seized during a traffic stop, but there was a threshold question whether certain actions by police (police questioning, taking the defendant's license, a search of the defendant's pockets) amounted to seizures. The defendant failed to argue to the trial court that some of those actions amounted to a seizure, and the court therefore rejected some of her arguments on preservation grounds because those arguments represented "discrete legal theories as to specific actions of the officers, each of which allegedly constituted a seizure." *Id.* at 628-29. By contrast, in this case, there was no dispute that the officer's actions represented an ongoing seizure; the question was whether any justifications for that seizure had expired while the seizure was ongoing.

[7] As noted, there is no question that Dowd's conduct here—standing outside the car window, asking if defendant had any weapons, asking defendant to exit the vehicle, and requesting consent to search—amounted to a continuation of the traffic stop. *See, e.g., Rodgers/Kirkeby*, 347 Or at 627-28 (concluding, in *Kirkeby*, that when after an officer's justification for traffic stop ended, the officer's subsequent verbal inquires—a request for consent to conduct a patdown and request

already completed his investigation into the traffic violation; he had filled out the citation and could have given it to defendant. The only other proffered justification for the continuation of the stop, the identity theft investigation of the passenger, had likewise evaporated; Baskett could not find any information about that case to confirm his suspicions. Thus, even if we assume that the officers lawfully extended the stop to investigate the passenger's involvement in the identity theft, once that investigation ended and the officers were prepared to give defendant his citation, there was no basis for their continued seizure of defendant. Accordingly, that seizure violated Article I, section 9.

The question that remains is whether that unlawful conduct tainted the officers' discovery of the evidence sought to be suppressed—the brass knuckles and the bag found in the car, which was later determined to contain methamphetamine and drug paraphernalia. Where, as here, an unlawful stop precedes a defendant's consent to search and there is no question that the defendant gave that consent voluntarily, we examine "the totality of the circumstances to determine whether the state had carried its burden of proving that the consent was independent of, or only tenuously related to, the unlawful police conduct." *State v. Unger*, 356 Or 59, 86, 333 P3d 1009 (2014). We look to the temporal proximity between the misconduct and the consent; the existence of any intervening or mitigating circumstances; and the nature, purpose, and flagrancy of the misconduct. *Id.* In looking at the totality of the circumstances, the underlying question is "whether police 'exploited' or 'took advantage of' or 'traded on' their unlawful conduct to obtain consent, or—examined from the perspective of the consent—whether the consent was 'tainted' because it was 'derived from' or was a 'product of' the unlawful conduct." *Id.* at 80.[8]

---

for consent to search the contents of the defendant's pockets—represented an unlawful continuation of the seizure); *State v. Backstrand*, 354 Or 392, 407, 313 P3d 1084 (2013) (explaining that, in *Rodgers/Kirkeby*, "[f]rom the standpoint of a reasonable person in the defendants' position, when the officers in both cases, after completing the investigation of the traffic offenses, asked unrelated questions and asked for consent to search, but did not tell the defendants that they were free to leave, those verbal inquiries communicated a continuation of the traffic stop, even though the officers no longer had authority to detain").

[8] In *Unger*, the court explained that, in some cases, "there may be a direct causal connection between the prior illegal stop and the consent because the

Defendant first notes, and the state acknowledges, that the proximity between the police illegality and the defendant's consent to search was close. Dowd requested and received defendant's consent while the unlawful seizure was ongoing, just as defendant was complying with Dowd's requests to get out of the car. Further, the parties agree that no mitigating or intervening circumstances, such as *Miranda* warnings or other admonitions, separated defendant's consent from the unlawful police conduct: Defendant was not told that he could simply remain in the car or that he could refuse to consent to the search. Those considerations suggest that defendant's consent was the product of the unlawful conduct.

But those considerations do not foreclose the state's effort to prove that the consent was only tenuously related to the unlawful conduct. *See Unger*, 356 Or at 90 (concluding that the state met its burden of proving a lack of exploitation even though the temporal proximity was close and there were no intervening or mitigating circumstances). We must also assess "the actual police misconduct," which involves an examination of "the nature, extent, and severity of the constitutional violation," as well as "the purpose and flagrancy of the misconduct." *Id.* at 86.

We start with the narrow—and, here, straightforward—inquiry into the "flagrancy" of the police misconduct. There is no dispute that the officers' conduct was "restrained," without threats or intimidation, rather than "flagrant." *Id.* at 82. Indeed, defendant acknowledges that "the encounter was calm." Although that kind of restrained

request for consent itself (and the evidence gathered) resulted from police knowledge of the presence of that evidence, which they had only because they had observed it during the illegal stop." 356 Or at 86. That direct connection may be found, for example, when "the police illegally stop a vehicle, allowing them to view contraband that otherwise would not have been visible, and then request the driver's consent to search the vehicle as a result of what they saw." *Id.*; *see, e.g.*, *State v. Musser*, 356 Or 148, 157-58, 335 P3d 814 (2014) (concluding that there was exploitation, in part, "because the officer pursued several lines of inquiry 'spurred by his observations of the contents of defendant's purse during the unlawful seizure'"). Although there is nothing to suggest that Dowd's request for defendant's consent to search was a result of knowledge of inculpatory evidence observed during the unlawful stop, the evidence discovered as a result of that search "may be subject to suppression if the police obtained the consent to search through less direct exploitation of their illegal conduct." *Unger*, 356 Or at 86.

interaction does "not present the kind of flagrant circumstances that likely would have affected defendant's voluntary consent," *State v. Lorenzo*, 356 Or 134, 145-46, 335 P3d 821 (2014), the absence of flagrant conduct, though relevant, does not control the exploitation inquiry. *See Unger*, 356 Or at 82 n 10, 85 (explaining that "absence of flagrant conduct" is relevant to assessing exploitation, but cautioning that "we do not hold that polite police misconduct necessarily means that the subsequent consent is valid").

We also look to the "purpose" of the officer's conduct, which may be "relevant both to understanding the nature of the misconduct and, ultimately, to deciding whether the police exploited that misconduct to obtain consent to search." *Id.* at 83. Our task is to objectively evaluate the circumstances, focusing on "statements made by the [officers] and the undisputed facts surrounding the contact with defendant," rather than their "subjective intent or motivations." *Id.* at 90. In this case, the record shows that the officers wanted to ensure that the passenger, not defendant, drove the car, and they identified two ways to achieve that end: direct the swap themselves or issue the citation and observe defendant and the passenger switch places from a distance. Certainly, the officers did not affirmatively testify that they directed the switch in the hopes that they might find evidence of a crime or gain defendant's consent. *See State v. Musser*, 356 Or 148, 158, 335 P3d 814 (2014) (recounting officer's testimony that he stopped the defendant and her companion to make "sure they were not doing anything wrong" (internal quotation marks omitted)). But the fact that the officers did not affirmatively identity an investigatory aim is not particularly helpful to our inquiry in this case, given that the officers offered no explanation as to why they chose to continue the stop and direct defendant's movements rather than end the encounter.

Apart from the officers' testimony, a review of the circumstances, viewed objectively, does not clarify their purpose. *See Unger*, 356 Or at 83 (explaining that a review of the "objective circumstances may indicate the police purpose in engaging in conduct later determined to be unlawful"). On the one hand, at least part of the officers' focus, up to the point where they unlawfully extended the stop, was

the investigation of crime unrelated to a traffic infraction: Baskett initially followed the vehicle because he believed it was involved in the identity theft; during the stop, he maintained his suspicion that the passenger was involved in the identity theft; and, with respect to defendant, Baskett observed a large amount of cash and a police scanner, which he associated with an effort to avoid police detection. On the other hand, even though the officers initially had an investigatory purpose, nothing in the record shows that the aim of the particular unlawful conduct at issue was—and defendant reasonably understood it to be—the investigation of criminal activity unrelated to defendant's traffic violation. *See Musser*, 356 Or at 159 (noting, with respect to the "purpose" of the misconduct, that, during the unlawful stop, the officer "eventually focus[ed]—*as [the] defendant well understood*—on drug possession" (emphasis added)). In short, the record does not definitively reveal the purpose of the officers' unlawful conduct in a way that illuminates whether defendant's consent was significantly affected by that conduct. *See id.* (explaining that officer's inquiries about "various possible crimes" showed the officer "taking advantage of that misconduct in a way that likely had an effect on [the] defendant's decision to consent").

We turn, finally, to an overlapping concern relevant to our exploitation inquiry—"the nature, extent, and severity of the constitutional violation." *Unger*, 356 Or at 86. The court has explained that, "[i]f the conduct is intrusive, extended, or severe, it is more likely to influence improperly a defendant's consent to search. In contrast, where the nature and severity of the violation is limited, so too may be the extent to which the defendant's consent is 'tainted.'" *Id.* at 81. Three cases—*Unger, Lorenzo,* and *Musser*—illuminate that qualitative, fact-intensive distinction.

In both *Unger* and *Lorenzo*, the court concluded that the police misconduct was limited rather than severe. In *Unger*, four officers, who were investigating a complaint about drug activity, unlawfully trespassed on the defendant's property when they followed a path around to the defendant's back door, where the defendant eventually consented to their entry. The court reasoned that, although the officers had conducted an unlawful "search" to reach the

back door, they had interacted with the defendant "just as they would have at the front door," their conduct "did not rise to the level of an unlawful arrest or stop," and they "did not unlawfully enter [the] defendant's home or ignore any gates or 'no trespassing' signs." *Unger*, 356 Or at 89, 92. In *Lorenzo*, an officer, who was concerned for the defendant's safety, opened the defendant's apartment door and reached in to knock on a bedroom door in order to contact the defendant, who later consented to the officer's entry. The officer's unlawful search, the court explained, "was limited in time and severity"—it ended before the officer requested consent to enter the apartment—and "did not demonstrate any effort to control or direct [the] defendant." *Lorenzo*, 356 Or at 143-44.

The court contrasted those minimal intrusions with more severe police misconduct in *Musser*. There, an officer saw the defendant walking at night in a high-crime area behind a shopping center, and the officer, without reasonable suspicion, called out to her, stopped her, and later requested to search her purse during the stop. The court observed that, in *Musser*, "the police order to [the] defendant to return and talk to the police, rather than to continue in the direction she was heading, clearly indicated to [the] defendant that she had no choice but to respond to the order, bringing her significantly under the control of the police." *Musser*, 356 Or at 157. That unlawful stop "was a more severe violation of [the] defendant's rights than the violation in *Unger*, which was a daytime trespass onto the defendant's property that allowed the police to contact the defendant at his back door, or the similar conduct in *Lorenzo*, where the officer reached into the defendant's apartment to knock on the defendant's bedroom door in an effort to contact him because of concern for his safety." *Id.* at 156.

Here, like the police conduct in *Musser*, the officers' actions reasonably conveyed to defendant that he "had no choice but to respond to the [officers'] order[s], bringing [him] significantly under the control of the police." *Id.* at 157. Instead of giving defendant the citation that he was told he would be given, the officers gave defendant (and the passenger) a series of instructions. Dowd told defendant "that [he] was going to be asking [defendant] to step out of the car," but

before Dowd did so, he "asked if [defendant] had any weapons on his person." When defendant said he did not, Dowd "went ahead and asked him to step out of the vehicle." Then, just as defendant was getting out of the car, Dowd asked for his consent to search. Given that the officers did not inform defendant that he was free to remain in the car and end the encounter, the officers' actions conveyed to defendant that his compliance with their instructions was a condition on receiving the citation and being allowed to leave.

Further, unlike the conduct at issue in *Unger* and *Lorenzo*, here the officers' actions represented an effort to direct or control defendant that gave them an advantage over defendant. Whereas the unlawful trespass to the defendant's back door in *Unger* allowed the police to interact with the defendant and request consent in the same way they would have if they acted lawfully by using the front door, here the unlawful conduct gave the officers a significant advantage in terms of their ability to control defendant's movements and request his consent at a time when the officers were exerting that control. For the first time in the encounter, the officers required defendant and the passenger to get out of the vehicle, even though they had no justification for doing so. Further, in contrast to *Lorenzo*, where the officer's unlawful conduct (reaching inside the apartment to knock on a bedroom door) had ended, Dowd requested defendant's consent to search just as police were increasing their efforts to control defendant's movements. In sum, the nature of the misconduct in this case was severe and weighs against a conclusion that defendant's consent was only tenuously connected to the officers' unlawful actions.

To recap our review of the totality of the circumstances: The officers requested defendant's consent in the midst of an unlawful stop, and they never informed defendant that he was free to end the encounter or free to refuse consent. Although the officers were polite during the encounter, they escalated their control over defendant and intensified their show of authority at the time they requested consent. Further, because the officers told defendant that he would be given the citation but did not tell defendant that he was free to end the encounter, their actions conveyed that he had no choice but to comply with the series of requests from

the officers—to get out of the car, to consent to a search—in order to receive the citation. In that sense, the officers' misconduct, by connecting defendant's consent to search with his ability to go on his way, placed defendant at a disadvantage, and the officers traded on the illegality to gain his consent. In light of all of those considerations, we conclude that the state has not met its burden of showing that the officers did not exploit their unlawful seizure of defendant to obtain his consent to a patdown search.[9]

Accordingly, the evidence that the search revealed, the brass knuckles, should have been suppressed as the product of the unlawfully extended stop. In addition, as the state acknowledges, the bag of drugs and drug paraphernalia found when the police searched the car must also be suppressed because the illegality of the consent search tainted the later searches of the car and the bag found in the car. That is so because the discovery of the brass knuckles forms the basis for the two asserted justifications for the officers' warrantless search of the car: search incident to the arrest (for felon in possession of a restricted weapon) and the automobile exception (to search the vehicle for evidence of the crime of felon in possession). *See State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986) ("Under the Oregon Constitution, a search incident to arrest is valid when it relates to a crime *which there is probable cause to believe the arrestee has committed*, and when it is reasonable in all the circumstances." (Emphasis added.)); *Watson*, 353 Or at 785 n 19 ("Pursuant to the 'automobile exception,' an officer who has stopped a mobile vehicle may conduct a search without a warrant if the officer has probable cause to believe that the vehicle contains evidence of a crime." (citing *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986)). In other words, the search of the car was unlawful because it could only be justified by the unlawful discovery of the brass knuckles. It follows that

---

[9] Defendant also argues that, "even if obtaining [his] consent was not connected to the prior illegality and the evidence obtained from defendant's person at that point was lawful, the facts did not justify further searches of defendant's vehicle." He contends that the search of the car does not fall within the warrant exception for searches incident to arrest or searches under the automobile exception. Given our conclusion that defendant's consent to search his person was a product of the unlawful extension of the stop, we need not address those arguments.

the bag found in the car and its contents should have been suppressed.[10]

In sum, even if we assume that the officers lawfully extended the stop to investigate the passenger's involvement in the identity theft, once that investigation ended and the officers were prepared to give defendant his citation, the officers violated Article I, section 9, when they did not issue the citation and instead continued to seize defendant without justification. Because the state has not shown, under the totality of the circumstances, that defendant's consent to search was only tenuously related to that misconduct, the illegality tainted that consent search and the subsequent searches of the car and the bag found therein. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded on Count 1; otherwise affirmed.

---

[10] On appeal, defendant also argues, preemptively, that the warrant to search the bag did not sever the connection between the unlawful police conduct and the evidence found in the bag because, to obtain the warrant, the officers "traded on the information obtained throughout the unlawfully extended encounter with defendant, the unlawful search of his property, and the unlawful seizure of the property." Because the state does not argue that the warrant severed the illegality between the unlawfully extended stop and the discovery of the evidence in the bag, we do not address that argument.