Argued and submitted December 20, 2007, reversed and remanded May 7, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN J. La FRANCE,
*Defendant-Appellant.*

Josephine County Circuit Court
04CR0086; A129310

184 P3d 1169

Tammy W. Sun, Deputy Public Defender, argued the cause for appellant. With her on the brief were Ingrid Swenson, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Anna Marie Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant appeals from a judgment of conviction for manufacturing a controlled substance, *former* ORS 475.992(1)(b) (2003), *amended by* Or Laws 2005, ch 708, § 39, *renumbered as* ORS 475.840(1)(b) (2005), possession of a controlled substance, *former* ORS 475.992(4)(b) (2003), *renumbered as* ORS 475.840(3)(b) (2005), and driving while suspended, ORS 811.182. Arguing that "any and all objects, information, statements and observations obtained by and resulting from the stop and subsequent search of the defendant" derived from violations of Article I, section 9, of the Oregon Constitution[1] and the Fourth Amendment to the United States Constitution,[2] defendant assigns error to the trial court's denial of his motion to suppress. We review the legality of searches and seizures for errors of law, but we defer to the trial court's findings of historical fact so long as there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). For the reasons expressed below, we reverse and remand.

The following facts are taken from the record. At approximately 1:00 a.m. on January 21, 2004, Officer Lidey was on routine patrol in uniform and in a marked police car when he noticed a van parked at a gas station with its engine running. Lidey observed defendant walking around the van. Lidey radioed his dispatcher and asked the dispatcher to run a records check on the van's license plate numbers. He then

---

[1] Article I, section 9, provides as follows:

"*No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure*; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

(Emphasis added.)

[2] The Fourth Amendment to the United States Constitution provides as follows:

"*The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated*, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

(Emphasis added.)

parked next to the van but in a manner so as to not prevent it from leaving. Also, Lidey did not activate his emergency lights or siren.

Lidey approached defendant and asked if he was having problems with his automobile. Defendant replied in the negative. Lidey then asked defendant if he had any identification, and defendant gave Lidey an Oregon identification card. Lidey radioed the information on the card to his dispatcher and then handed the card back to defendant. In all, Lidey possessed the card for less than a minute. After Lidey handed the card back to defendant, he asked defendant who owned the van. Defendant responded that the owner's name was "Richard." Lidey knew, however, from information given to him by the dispatcher that the van's registered owner was not named "Richard." Lidey asked defendant what he was doing at the station, and defendant said he was waiting at that location, a response Lidey thought odd because it was after 1:00 a.m. Lidey then received information from his dispatcher that defendant's driving privileges were suspended and that he was on probation for the felony offenses of delivery of a controlled substance, unauthorized use of a vehicle, and identity theft.

Lidey then asked defendant if he had anything illegal on his person or inside the van, and defendant responded, "I might have some scales or some empty bags inside." Lidey advised defendant of his *Miranda* rights and asked if he could search defendant. Defendant consented to the search of his person, and Lidey searched him. That search did not reveal any evidence, and Lidey asked defendant if he could search the van. Again, defendant consented. While searching the van, Lidey observed an open camera bag in the van's center console. In the open portion of the bag, Lidey could see a methamphetamine pipe. Lidey then asked defendant if he could search the bag, and defendant consented. Inside the bag was a container with a brown crystalline substance that Lidey believed, based on his experience, to be methamphetamine. Lidey administered a field test on the substance, and it tested positive for amphetamines. Lidey then arrested defendant for possession of a controlled substance.

After holding a hearing on defendant's motion to suppress, the trial court ruled:

> "The defendant did not testify. According to the Officer's testimony, the Defendant's vehicle was already stopped when he was approached by the Officer; and the Defendant was outside the vehicle, which was running. It was 1:00 am and the Defendant and his vehicle were in the parking lot of an open Union 76 station in the north end of Grants Pass near the interstate freeway. The Officer testified that as he approached in his vehicle, he did not activate his lights or siren; and did not park his vehicle in such a way as to block the Defendant from taking his leave. Officer Lidey was dressed in a police uniform, with a badge, and with a holstered sidearm. Nevertheless, he testified that his initial conversation with the Defendant, and all subsequent contact was polite and cooperative on the part of each person.

> "The Officer first asked if the Defendant was having trouble with his van and then where he was coming from, and where he was going. In short order, the Officer asked for the Defendant's identification. The Defendant produced an Oregon Identification Card, which the Officer retained for a minute or less, to run a warrant check. During the time of retention, no questioning took place. The warrant revealed that the Defendant had a warrant for misdemeanor driving while suspended.

> "After this was revealed, the Defendant was not immediately taken into custody but continued conversing with the Officer and revealed that he was on felony probation for delivery of a controlled substance. Thereafter, the Officer asked if there [was] anything illegal in the van, and the Defendant indicated that at first there might be 'bags and a scale.' Then, the Officer advised the Defendant of his Miranda Rights, and requested permission to search both Defendant's person and vehicle, which consent was given.

> "* * * * *

> "The most serious question involves the retention of the defendant's driver license, or in this case his identification card. Many cases hold that when an officer takes a person's driver license, that person is not free to leave. Other cases hold to the contrary. The cases seem to focus on the duration that the license is taken away from the defendant, and

what is happening while the license is in the officer's possession. In [this] case, Officer Lidey testified that he had the Defendant's ID for less than a minute and used it only to call dispatch. During the call, he learned that the Defendant's license was misdemeanor suspended. According to the testimony, he did nothing during the period of time when he had the license, other than to telephone dispatch.

"* * * Officer Lidey's retention of the Defendant's identification card in this case did not constitute a stop either individually, or taken together with all other circumstances of this encounter.

"In sum, the Defendant was not stopped. The 'mere conversation' engaged in between the Officer and Defendant led to probable cause to arrest, a legitimate request for consent to search, and a voluntary consent to search."

Following the trial court's denial of his motion to suppress, defendant entered a conditional guilty plea pursuant to ORS 135.335(3), reserving his right to appeal the trial court's denial of his motion to suppress.[3] In accordance with the plea, the trial court entered judgments of conviction as stated above.

■ On appeal, defendant reasserts his argument that, when Lidey asked for and took defendant's identification card, an illegal restraint of his liberty occurred because, at the time, the officer lacked reasonable suspicion of criminal activity. Relying on *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), defendant posits that he demonstrated that he was illegally stopped and the state failed to prove that his subsequent consents to search were not obtained by an exploitation of the illegal detention.

■ A stop occurs under Article I, section 9, when a police officer temporarily restrains a person's liberty. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991). For such a stop to be legal, the officer must have reasonable suspicion

---

[3] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

that the person is involved in criminal activity. *Id.* To determine whether a person has been stopped, a court should consider "the totality of the circumstances surrounding the encounter to determine whether the officer has intentionally and significantly interfered with the defendant's liberty, or whether the defendant, in an objectively reasonable manner, believes that his or her liberty has been restricted." *State v. Highley*, 219 Or App 100, 105, 180 P3d 1230 (2008) (citing *Holmes*, 311 Or at 408-10). In *Highley*, we explained the totality of the circumstances test:

> "In short, a *retention* of a suspect's identification, or the length of retention of a suspect's identification, is not the touchstone of whether a stop has occurred. Rather, the question is whether, under the totality of the circumstances, the suspect reasonably believes that he or she is under investigation and is not free to leave."

*Id.* at 109 (emphasis in original).

This case presents facts that are similar to the facts in *Highley*, except that the defendant in *Highley* was not the driver of a motor vehicle. In that case, the officer requested the defendant's driver license and, after writing down the information from it, returned it to the defendant. *Id.* at 103. He then returned to his patrol car and ran a records check. *Id.* The officer had retained the defendant's identification for approximately 30 seconds to a minute. *Id.* After learning that the defendant was not on probation, the officer again approached him and asked for consent to search his person. *Id.* The defendant agreed and pulled a container out of his pocket, an act that eventually resulted in the discovery of controlled substances. *Id.* We observed that, for purposes of Article I, section 9, a stop occurs when a police officer-citizen encounter goes beyond a mere conversation that involves no restraint on liberty. *Id.* at 105. We held that a reasonable person would conclude under the totality of the circumstances that the police officer-citizen encounter had evolved into a stop because a reasonable person in the defendant's circumstances would have understood that, having given his personal identification to a police officer, he was the subject of an ongoing criminal investigation and that he was not free to leave until that investigation had been completed. *Id.* at 110. Similarly, in this case, we conclude that a reasonable person

in defendant's circumstances would not have believed that he was free to leave until the officer completed his investigation. Thus, Lidey's actions under the totality of the circumstances operated as a restraint of defendant's liberty when, at the time, Lidey lacked a reasonable suspicion based on articulable facts that defendant had committed a criminal or traffic offense.[4]

The state argues, nonetheless, that any taint from the unlawful stop was purged by the discovery that defendant had committed the crime of driving while suspended. That discovery, in the state's view, gave the officer justification for a further detention of defendant, which then resulted in defendant's voluntary consent to the searches conducted by Lidey.[5] In *Hall*, the court explained how the state's burden to show that evidence is not derivative from a prior illegality operates:

"Although the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law,' this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct. Instead, as this court recently explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), after a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section

---

[4] ORS 807.570(1)(b)(A) makes it unlawful for a driver not to present and deliver a driver license to a police officer when requested by the police officer after being lawfully stopped or detained when driving a vehicle. Here, however, no lawful stop or detention occurred before Lidey took defendant's identification card and radioed the dispatcher. At that point, the consensual nature of the encounter dissipated, and the encounter evolved from a mere conversation into a restraint on defendant's liberty or movement. *Hall*, 339 Or at 19.

[5] The state also argues that, under ORAP 5.45(1), defendant did not adequately preserve his argument that the police exploited a prior illegality to obtain his consent to search. We disagree. In defendant's Memorandum of Law in Support of Motion to Suppress, defendant asserted that "[c]onsent obtained by exploiting an illegal police conduct is invalid. Officer Lidey took advantage of the illegal stop to obtain consent." (Citations omitted.)

9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

*Hall*, 339 Or at 24-25 (citations omitted). In light of that background,

"[a]fter a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* at 34-35.

■ Here, defendant has shown the necessary factual nexus between the evidence sought to be suppressed and the illegal stop: but for the illegal stop of defendant, Lidey would not have asked for defendant's consent to search the van and would not have found the controlled substance in defendant's camera bag. Thus, for that evidence to be admissible, the state must carry its burden of showing that the evidence is not derivative of the preceding illegality. In response to that issue, the state argues that "the facts of this case present not one, but two 'intervening circumstances' that broke any causal connection between any illegality and defendant's consent: Officer Lidey's knowledge that defendant committed a crime while driving while suspended created one intervening circumstance * * * and the *Miranda* warnings served as yet another intervening circumstance." (Footnote omitted.)

■ Initially, we reject the state's argument that the giving of *Miranda* warnings operated as an intervening or mitigating circumstance in this case. *See Hall*, 339 Or at 35 n 21. A reasonable person in defendant's position would not interpret those warnings—the right to remain silent and not to make incriminating statements, the right to have advice of counsel, and the right to have court-appointed counsel at public expense—to mean that the person was not required to consent to a request to be searched. Rather, the warnings, generally given to persons in custody, could perpetuate the person's perception that his or her liberty continued to be restrained as the officer pursued a criminal investigation by seeking consent to a search.

The fact that Lidey was informed by the dispatcher that defendant's driving privileges were suspended before he asked defendant for consent to search presents a closer question. The state contends that, at that point in time, Lidey "was obligated to follow up on an apparent crime[,]" and that "once Officer Lidey discovered that defendant had committed a crime, he had a separate basis to engage with defendant." In support of its contention, the state points to cases like *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967), and *State v. Snyder*, 72 Or App 359, 361, 695 P2d 958, *rev den*, 299 Or 251 (1985), cases in which we and the Supreme Court have held that the existence of an outstanding arrest warrant can

serve to attenuate the link between a police illegality and evidence discovered thereafter. Comparing the discovery that defendant's driving privileges were suspended with the facts in those cases, the state contends that Lidey did not exploit the illegal stop in order to obtain defendant's consent to search.

As we observed in *State v. Taylor*, 151 Or App 687, 692, 950 P2d 930 (1997), *rev den*, 327 Or 432 (1998), *Dempster* and *Snyder* involve circumstances where the searches of the defendants followed the discovery of an outstanding arrest warrant. Under those circumstances, the taint of a prior illegal stop or arrest was purged because the searches were made incident to arrests based on the arrest warrants. In other words, the discovery of the outstanding arrest warrants and their execution constituted intervening events that interrupted the causal connection between the seized evidence and the prior illegal stops and thereby provided an alternative lawful basis for the subsequent searches.

We are unpersuaded by the state's reliance on the reasoning in *Dempster* and *Snyder*. In those cases, the subsequent searches were deemed lawful because they were incident to lawful arrests that actually occurred. Here, at most, the record is susceptible to the conclusion that Lidey had probable cause to arrest defendant for driving while suspended based on the information given to him by the dispatcher and his observation of defendant walking around the car. But beyond that conclusion, the state's argument requires us to speculate that, had Lidey arrested defendant for driving while suspended and then asked him for consent to search, defendant would have consented.

Moreover, unlike in *Dempster* and *Snyder*, the record is not adequate to support the conclusion that a search of the camera bag would have been authorized as a search incident to an arrest. As the Supreme Court explained in *State v. Caraher*, 293 Or 741, 757, 653 P2d 942 (1982), "a valid custodial arrest does not alone give rise to a unique right to search. Such a warrantless search must be justified by the circumstances surrounding the arrest." Accordingly, a search

incident to arrest is justified only when it is conducted to protect the officer's safety, to prevent the destruction of evidence, or to discover evidence relevant to the crime for which the defendant was arrested. *Id.* at 759. In this case, defendant's camera bag, based on the record before us, has no apparent nexus to the crime of driving while suspended, and, thus, the search of the bag as an incident to arrest for that offense would have exceeded the scope of a permissible search under Article I, section 9.[6] Whether an intervening event purges the taint of a prior illegality will depend on the circumstances that actually exist in a case. The record in this case is simply inadequate for us to apply the rule of *Dempster* and *Snyder*.

▆▆▆▆ Apart from its argument that the discovery that defendant's driver license was suspended purged any taint from the unlawful stop, the state argues that Lidey did not exploit the unlawful stop in order to obtain defendant's consent to the searches. The state agrees that, under *Hall*, it has the burden to prove that defendant's consent to the searches was independent of, or only tenuously related to, the unlawful stop. The aim of Oregon's exclusionary rule is to restore a defendant to the same position as if the state's officers had stayed within the law. The state does not refer us to any source of law that authorized Lidey to obtain defendant's identification from him under the circumstances that existed in this case. In the absence of any reasonable suspicion that defendant had committed a crime or probable cause that he had committed a traffic offense, Lidey exceeded his lawful authority by obtaining and retaining defendant's identification. But for that retention, he would not have learned that defendant's driving privileges were suspended and that he was on probation for various offenses. A causal connection requiring suppression exists when the police seek consent to search solely as the result of inculpatory evidence obtained from unlawful police detention. When defendant is restored to the same position as if Lidey had stayed within the law, it becomes apparent that the inculpatory evidence relied on by the state—that defendant was driving while suspended—

---

[6] The state does not argue that the situation presented officer safety or destruction of evidence concerns.

was obtained solely as the result of an unlawful detention and that the state has failed to carry its burden to demonstrate an intervening or mitigating circumstance that thereafter interrupted the causal connection between the prior illegal stop and defendant's consent to search. It follows that the trial court should have granted defendant's motion to suppress the evidence seized from his camera bag.

Reversed and remanded.